# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **OMAR SHARIF WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:08CV41** |
| | ) | |
| **COMPUTER SCIENCES** | ) | |
| **CORPORATION, d/b/a CSC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

**SHARP, Magistrate Judge**

This matter comes before the Court on the Motion for Summary Judgment filed by Defendant Computer Sciences Corporation ("CSC"). (Docket No. 25.) CSC has also filed a Motion to Strike Exhibits B, C, and D to Plaintiff's response in opposition to summary judgment. (Docket No. 35.) Both of these motions have been fully briefed and are now ready for ruling. For the reasons stated herein, this Court denies Defendant's Motion to Strike but grants Defendant's Motion for Summary Judgment.[1]

---

[1] The parties have consented to the trial jurisdiction of the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff alleges in his Complaint that he was wrongfully terminated by Defendant CSC based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. (Docket No. 1, Complaint ("Compl."), at 4-5.) Plaintiff also alleges that Defendant failed to promote him in violation of Title VII. (*Id*. at 5.) Defendant, on the other hand, contends that Plaintiff was never an "employee" of Defendant but instead was a subcontractor, and that even if Plaintiff was an employee, he was terminated for legitimate, non-discriminatory reasons. (Docket No. 26. Def.'s Mem. in Supp. of Mot. for Summ. J. at 1.)

Plaintiff alleges in his Complaint that on May 20, 2006, he was hired by Berrett & Associates, LLC ("Berrett"), an employment placement agency. (Compl. at 2.) Melanie Berrett is the president of Berrett & Associates. (*Id*.) Plaintiff further alleges that Ms. Berrett placed him at CSC in approximately November 2006 as a network engineer. (*Id*.) The Court notes that this alleged date may be in error because the employment letter Plaintiff attached to his summary judgment response brief appears to show that he was hired by Ms. Berrett to work at CSC beginning on May 22, 2006.[2] (Docket No. 33, Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J., Ex. C.) CSC had a contract with the United States

---

[2] In addition, Plaintiff testified during his deposition that in September or October 2006 he asked Michael Greenham, his supervisor at CSC, if he could leave his CSC job early. (Docket No. 33, Ex. F, Deposition of Omar Williams ("Pl.'s Dep.") at 128.) Thus, Plaintiff must have been working at CSC prior to November 2006.

Environmental Protection Agency to support the EPA network. (*Id*., Ex. E, Deposition of Michael John Vanover (30(b)(6)) at page 16.) Employees of CSC, Berrett, and other subcontractors worked together on the project performing the same duties. (*Id*.) When CSC had an opening that it wished to be filled through Berrett, CSC notified Berrett of the position and asked it to fill that position. (*Id*.) Berrett would then supply candidates to CSC, and the candidates would be interviewed by engineers and managers at CSC with the final hiring decision being made by the account executive. (*Id*. at 16-18.) Plaintiff was interviewed in this manner. (*Id*., Ex. F, Pl.'s Dep. at 91.)

Plaintiff testified during his deposition that after six months at CSC he was given a raise by Ms. Berrett. (*Id*. at 70.) Plaintiff received W-2 forms from Berrett. (Docket No. 26, Ex. C at 64.) Plaintiff believed that he could have participated in Berrett's retirement program but chose not to do so. (*Id*. at 69.) Plaintiff never applied to be an employee of CSC. (*Id*. at 186.) Plaintiff also testified that soon after he started work at CSC, his manager Andrew Lawin recommended to Michael Abbott that Plaintiff be selected to work on a project. (Pl.'s Dep. at 86.) Mr. Abbott responded by asking where a different network engineer was, Mr. Faris, and told Mr. Lawin, "No, we need to get the right person." (*Id*. at 88.) Plaintiff interpreted Mr. Abbott's comment about "getting the right person" to be racially motivated. (*Id*. at 91.)

At CSC, the network engineers were divided into two groups, the implementation group into which Plaintiff was placed and the design group. Plaintiff felt that his skills were

more appropriate for the design group. (*Id*. at 95, 109, 115.) He often played a game called "Stump the Chump" with the design group engineers and did well by answering questions that members of the design group could not answer. (*Id*. at 116, 119.)

The parties disagree as to whether Plaintiff asked for permission to work at a part-time job for AT&T. Plaintiff testified that he asked for permission from Mike Greenham, his CSC manager, to work for AT&T in September or October of 2006. (Pl.'s Dep. at 123.) Plaintiff said that particular job never started, however. (*Id*. at 129.) In February of 2007, Plaintiff did start working at another job at AT&T on Fridays, Saturdays, and Sundays during times that did not interfere with his CSC hours. (*Id*.)

Plaintiff testified during his deposition regarding a January or February 2007 incident in which Nancy Diamond, an administrative assistant in Plaintiff's work group, gave Plaintiff's attendance record to Plaintiff's supervisor, Michael Greenham. (Compl. ¶¶ 19-21; Pl.'s Dep. at 131-36.) Plaintiff believed that her doing so was racially motivated. (Pl.'s Dep. at 131.)

Plaintiff also testified about another incident involving Richard Mann, a CSC executive, which Plaintiff thought was racially motivated. (Compl. ¶ 17; Pl.'s Dep. at 138-39.) Plaintiff stated that while walking in the hall at the CSC office he glanced at Tim Ryan's wife, who is white, who was visiting the office. (Pl.'s Dep. at 138.) She was talking to Richard Mann at the time, and Mr. Mann looked "disgusted" with Plaintiff for glancing

at Mrs. Ryan. (*Id*. at 138-39.) Plaintiff believes that this look of disgust when he glanced at a white woman was racially motivated. (Compl. ¶ 17.)

Plaintiff testified that he was released from CSC on March 20, 2007. (Pl.'s Dep. at 146.) He said that on that day it was announced that Michael Abbott would be absent due to "something like" emergency surgery. (*Id*. at 147.) Plaintiff, in front of his manager Michael Greenham and his co-worker John Fritz, "showed elation over that"[3] because of the way Plaintiff thought Mr. Abbott had treated him. (*Id*.) After lunch on that day, Mr. Greenham called Plaintiff into Mr. Abbott's office where Mr. Greenham told Plaintiff, "that thing with Jill and Maxim that was the last straw. We heard you're working for the competitor, it's a conflict of interest. You're terminated effective immediately." (*Id*.) Mr. Greenham was referring to Plaintiff's work AT&T as the conflict of interest. (*Id*. at 149.) The "Jill and Maxim" incident occurred when CSC manager Jill Smith walked by Plaintiff when he was viewing on his computer a web site, Maxim, which she considered to be inappropriate. (*Id*. at 150.)

Michael Greenham is a Berrett subcontractor for CSC. (Docket No. 33, Ex. G, Deposition of Michael Greenham, at 9.) He described Plaintiff as a "very book smart engineer." (*Id*. at 28.) Plaintiff was very good at the game "Stump the Chump" which showed his technical knowledge. (*Id*.) Plaintiff helped the design group at times overcome

---

[3] Plaintiff later agreed that what he did could be described as a "happy dance." (Pl.'s Dep. at 148.)

problems. (*Id*.) However, Mr. Greenham testified in his deposition that Plaintiff did not come to him first and ask for permission before taking the job with AT&T. (*Id*. at 37.) Mr. Greenham stated that he had approved a part-time job for Plaintiff's co-worker, DyTanyon Norman, because that job was not in an engineering department and did not present a conflict of interest with CSC work. (*Id*.) Mr. Greenham testified that when he released Plaintiff he did not intend to, and did not have the authority to, fire Plaintiff from Berrett & Associates. (*Id*. at 43.)

Michael John Vanover was a senior manager during the time that Plaintiff worked at CSC. (Docket No. 26, Ex. A, Deposition of Michael John Vanover, at 4, 8.) Mr. Vanover explained that Berrett employees did not go through the CSC orientation program as did CSC employees. (*Id*. at 52-53.) CSC employee badges were different from the badges worn by subcontractors such as Plaintiff. (*Id*. at 55.) CSC employees had access to a phone number for human resources functions, but Berrett employees did not have access to that number. (*Id*. at 56.) Plaintiff received his paychecks through Berrett. (*Id*. at 58.) If CSC had to discipline a Berrett employee, it would contact Ms. Berrett, and CSC would have no role in the disciplinary action. (*Id*. at 59.) CSC did not keep personnel records on Berrett employees. (*Id*.) Ms. Berrett controlled the pay raises of Berrett employees. (*Id*. at 60.) Berrett employees were not invited to CSC employee meetings. (*Id*. at 61.) Finally, the time entries for CSC employees were processed differently from the time of Berrett employees. (*Id*. at 62.)

Michael Greenham testified that he spoke to Ms. Berrett about Plaintiff three or four times.  (Docket No. 26, Ex. B, Deposition of Michael Greenham, at 13.)  Two of these times concerned work that Plaintiff was assigned but was not completing on time.  (*Id*. at 14.)  Another involved a "Golden, Colorado R&R" incident of which Mr. Greenham did not remember the details.  (*Id*.)  He remembered having a discussion with Plaintiff about the need for subcontractors to prove every day their worth to the contract.  (*Id*.)

Mr. Greenham also testified regarding the events leading up to Plaintiff's release from work at CSC.  Mr. Greenham said that he ran into an acquaintance, Anthony, a network engineer working at AT&T who had formerly worked at CSC, who told Mr. Greenham that he had an ex-employee of Mr. Greenham working for him.  Mr. Greenham did not know who that was until Anthony identified this person as Plaintiff.  (*Id*. at 19.)  After hearing this and knowing that Plaintiff was still working at CSC, Mr. Greenham sought advice from account executive Richard Mann on how to handle the situation.  (*Id*. at 20.)  Mr. Greenham testified that he had given conditional permission for DyTanyon Norman, also an African-American, to work at AT&T but that Plaintiff did not ask him for such permission.  (*Id*. at 21, 44.)  Richard Mann told Mr. Greenham that he no longer wanted Plaintiff on the job site.  (*Id*. at 42.)

Mr. Greenham testified that Plaintiff was not an appropriate engineer for the design group because although Plaintiff had the technological understanding, he was deficient in implementing that knowledge in the context of the EPA contract.  (*Id*. at 29.)  Although

engineers in the implementation group sometimes did design work, traits that Mr. Greenham

specifically looked for when choosing a person for the design group included:  stick-to-it-

tiveness, completeness of thought, completeness of documentation, ability to perform in front

of a customer, ability to perform under pressure, and ability to get along with peers.  (*Id*. at

30-31.)  Mr. Greenham stated that Plaintiff was released because of a combination of job

performance problems, the Maxim on-line event, and the AT&T job.  (*Id*. at 35-36.)

  Mr. Greenham further testified that to his knowledge Berrett was never given a slot

to fill or more than one slot to fill on the design team while Plaintiff was at CSC.  (*Id*. at 44.)

## DISCUSSION

### A. <u>Summary Judgment Standard</u>

  Summary judgment is appropriate only when no genuine issue of material fact exists.

*Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991).  A genuine issue of fact exists if the

evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-

moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  A court

considering a motion for summary judgment must view all facts and draw all reasonable

inferences from the evidence before it in a light most favorable to the non-moving party.  *Id*.

at 255.  The proponent of summary judgment "bears the initial burden of pointing to the

absence of a genuine issue of material fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d

716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the

movant carries this burden, then the burden "shifts to the non-moving party to come forward

with facts sufficient to create a triable issue of fact." *Id*. at 718-19 (citing *Anderson*, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. *See, e.g., Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *see also Anderson*, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)

**B.    Analysis**

**1.    Admissible evidence**

Defendant CSC moves to strike three exhibits submitted by Plaintiff in opposition to Defendant's motion for summary judgment. (Docket No. 35.) Because this case is now in a summary judgment posture, rather than at trial, the Court will not strike these exhibits but will consider them only to the extent that they comply with Fed. R. Civ. P. 56(c)(2). Rule 56 requires that genuine issues of material fact be shown by "the pleadings, the discovery and disclosure materials on file, and any affidavits." Fed. R. Civ. P. 56(c)(2); *see Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."). The Federal Rules require that, at the summary judgment stage, documents be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). *Orsi*, 999 F.2d at 92.

Exhibit B to Plaintiff's memorandum in opposition to summary judgment is what purports to be a three-page partial transcript of a telephone conversation between Melanie Berrett and Plaintiff. (Docket No. 33, Ex. B.) Plaintiff seeks to rely upon this document to

show that Ms. Berrett said that there was nothing she could do about Defendant releasing Plaintiff from his work at CSC. (Docket No. 39, Pl.'s Resp. to Def.'s Mot. to Strike, at 2.) This "transcript" is signed by Plaintiff and bears a notary stamp. (Docket No. 33, Ex. B.) However, there is no authenticating affidavit attached to this "transcript," and Plaintiff fails to point to any deposition testimony which properly authenticates it. The document also does not contain certifications that the recording or the transcription is accurate or complete. Therefore, Exhibit B may not be relied upon to establish a genuine issue of material fact. *See* Fed. R. Civ. P. 56.

Exhibit C purports to be an offer letter from Melanie Berrett to Plaintiff for his work at CSC and an associated "Order Form." (Docket No. 33, Ex. C; Docket No. 39 at 3.) Plaintiff argues that Ms. Berrett produced this letter in response to a discovery request. (Docket No. 39, Ex. A, Subpoena.) Plaintiff also contends that this letter shows that he was hired through Ms. Berrett to work at CSC. (Docket No. 39 at 3.) Plaintiff claims that the letter is authenticated because it was produced in response to Plaintiff's subpoena. (*Id*.) However, there is nothing in the record to show that this letter was produced in response to a subpoena except for counsel's argument which, of course, is not evidence that may be considered pursuant to Rule 56. A letter must be attached to an affidavit and authenticated by its author in the affidavit or a deposition. *Orsi*, 999 F.2d at 92. Therefore, Plaintiff may not rely on Exhibit C to establish a genuine issue of material fact. *See* Fed. R. Civ. P. 56.

The final exhibit in question is Exhibit D which Defendant contends is simply irrelevant. This exhibit is a collection of pages some of which were purportedly downloaded from the internet web site "Yahoo! Finance" and others that were purportedly downloaded from the Defendant's internet web site. (*See* Docket No. 33, Ex. D; Docket No. 39 at 4.) Plaintiff argues that this information is relevant because "Defendant contends that Plaintiff was not terminated for racially motivated reasons but was terminated because he was working for a competitor, AT&T and that it was a conflict of interest." (Docket No. 39 at 3-4.) Plaintiff apparently contends that these pages show that AT&T was not a competitor of Defendant. These pages, however, in and of themselves are of extremely limited probative value for that purpose. They do not rule out the possibility that for the specific nature of Plaintiff's work for AT&T, CSC and AT&T were competitors.

Accordingly, although the Court will not strike these exhibits, their value to Plaintiff in opposing Defendant's summary judgment motion is extremely limited.

### 2.      Subject matter jurisdiction

Defendant first contends that this Court lacks subject matter because Berrett & Associates rather than CSC was Plaintiff's employer. (Docket No. 26 at 7-13.) In response, Plaintiff argues that he was a joint employee of CSC and Berrett & Associates. (Docket No. 33 at 7-11.)

The Fourth Circuit has adopted a test for determining the issue of employee status in Title VII cases. This test is a combination of the "economic realities test" and the common

law right-of-control test. *See Garrett v. Phillips Mills, Inc.*, 721 F.2d 979, 981-82 (4th Cir. 1983). Control is the most important factor to be considered, but it is not dispositive. *Id*. at 982. Courts examine the extent of control over the means and manner of the work and whether the purported employee had to account to the employer for his daily activities. *See E.E.O.C. v. Zippo Mfg. Co*., 713 F.2d 32, 38 (3d Cir. 1983).

In the present action, the managers used by CSC (whether they were CSC direct hires or subcontractors) exerted primary control over Plaintiff's daily activities. Mr. Greenham testified that either he or Andrew Lawin determined the tasks that an engineer such as Plaintiff was assigned based on the engineer's current workload, technical background, and the type of work he enjoyed performing. (Docket No. 26, Ex. B at 7.) Plaintiff was to report the completion of an assignment by filing a "CLIN 9." (*See id*. at 47 & attached email exhibit of 3/13/2007 to Plaintiff from Nancy Diamond.) When Plaintiff did not file CLIN 9s in a timely manner, Mr. Greenham spoke to him about them. (*Id*. at 33.) Plaintiff had set work hours and sent an email to co-workers and managers if he was going to be late or if he had to leave early. (Pl.'s Dep. at 131-33.) Therefore, Plaintiff was to a substantial degree under the control of representatives of CSC while working on the EPA project.

Turning to other relevant factors in determining employee status, Plaintiff's work, although requiring a high degree of knowledge and skill, was performed under the direction of his supervisors. *See Garrett*, 721 F.2d at 982. CSC supplied the equipment used in Plaintiff's work and supplied the location for performing the work. *Id*.; Docket No. 33, Ex.

E at 15-17.  The length of time during which Plaintiff worked for CSC is also relevant.

*Garrett*, 721 F.2d at 982.  Plaintiff worked at CSC for approximately ten months which

suggests some permanency in the relationship.  Another relevant consideration is whether

Plaintiff was paid by the time he worked or by the job.  *Id*.  Plaintiff was paid by the time he

worked.  (Docket No. 26, Ex. C at 69.)  This suggests that Plaintiff was an employee rather

than an independent contractor.  *See Garrett*, 721 F.2d at 982 (unlimited opportunity for

profit governed solely by sales performance suggestive of independent contractor status).

In addition, the work performed by Plaintiff was integral to CSC's business.

On the other hand, other factors suggest that Plaintiff should not be found to be an

employee of CSC.  These include that he was released without notice and that CSC did not

offer him retirement benefits.  In addition, CSC was not involved in Plaintiff's wage and

human resources functions.  These functions were handled by Berrett.

In consideration of all of these factors, the Court finds that, although the case is close,

Plaintiff has established by undisputed evidence that he was a joint employee of CSC and

Berrett.  The degree of control exercised by CSC over Plaintiff's work is critical to this issue,

and the factors suggesting that Plaintiff was not an employee of CSC are not of sufficient

weight to tip the scales in the other direction.  *See Thompson v. Estate of Frank H. Kenan*,

No. 1:99CV00102, 2000 U.S. Dist. Lexis 8758, at *8, 12 (M.D.N.C. Feb. 16, 2000) (setting

standard and stating that critical question for joint employer inquiry is degree of control of

hiring party over the work and its instrumentalities and circumstances).  (Docket No. 26, Ex. D.)

Defendant's motion to dismiss based on lack of subject matter jurisdiction is accordingly denied.

### 3.    Failure to promote (Second Cause of Action)

Plaintiff's Second Cause of Action is based on an alleged failure by Defendant to promote him to the design engineer group.  (Compl. ¶ 32.)  Plaintiff may survive Defendant's summary judgment motion by providing direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).  Plaintiff may use the proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Plaintiff argues that he has established a prima facie case of discrimination.  (Docket No. 33 at 11-13.)  He appears not to contend that he has presented sufficient direct evidence of discriminatory motive for either his failure-to-promote or his discharge claim.  (*See id*.) To any extent that he does so contend, the record wholly fails, for reasons set out below, to reveal sufficient direct evidence of discrimination.

To establish a prima facie case of discriminatory failure to promote under *McDonnell Douglas*, Plaintiff must show that: (1) he is a member of a protected class; (2) his employer had an open position for which he applied or sought to apply; (3) he was qualified for the

-14-

position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Evans*, 80 F.3d at 959-60. Defendant argues that Plaintiff has no evidence showing that his employer had an open position, that he was qualified for the position, or that he was rejected under circumstances giving rise to an inference of unlawful discrimination. (Docket No. 26 at 16-17.)

Plaintiff fails in briefing to directly respond to Defendant's argument concerning a lack of evidence of these elements. (Docket No. 33 at 11-13.) In his discussion of these issues, Plaintiff simply states that he "was treated differently when has [sic] was not placed in the design group, a position of prestige and a stepping stone for other positions." (*Id*. at 12.) Plaintiff further argues that "[n]o African-Americans were placed in the design group." (*Id*.)

Plaintiff fails, however, to identify any evidence which is cognizable under Rule 56 to show that either CSC or Berrett had an opening in the design group for which he applied or sought to apply. He alleged in his Complaint that "Berrett received a contract for a design engineer position" on or about November 1, 2006, but did not recommend him for the job. (Compl. ¶ 15.) When asked during his deposition if he ever "applied to be an employee of CSC," Plaintiff answered, "No, sir." (Pl. Dep. at 186.) Plaintiff makes no showing that he "applied" to anyone for the job of design engineer. Moreover, the only cognizable evidence in the summary judgment record on this point is Mr. Greenham's testimony that to his knowledge Berrett was never given a slot to fill or more than one slot to fill on the design

team while Plaintiff worked at CSC.  (Docket No. 26, Ex. B at 44.)  Plaintiff also does not

identify any person of another race less qualified than he, whom either employer hired into

the design group while he worked at CSC.[4]  He has presented no other evidence that would

give rise to an inference of discrimination with regard to his failure-to-promote claim.

Plaintiff has therefore failed to establish the second and fourth elements of a prima facie

case.

Defendant has presented evidence which tends to show that Plaintiff was not qualified

for the design engineer position, not because he lacked technical knowledge but due to other

characteristics of Plaintiff.  (Docket No. 26, Ex. B at 29-31.)  This Court need not decide

whether Plaintiff has established that he was qualified for a design group position, however,

given his failure to establish two other elements of a prima facie case.

Because Plaintiff has identified no direct evidence of a discriminatory failure to

promote, and because he failed to establish a prima facie case of a discriminatory failure to

promote, summary judgment will be granted to Defendant on Plaintiff's Second Cause of

Action.

---

[4] Given Plaintiff's allegation that the "open position" at issue became available on or about November 1, 2006, the Court does not understand Plaintiff's argument to be that he should have been placed in the design group upon his initial hire at CSC in May 2006. (Compl. ¶¶ 15, 32.)

### 4.    **Wrongful termination (First Cause of Action)**

To establish a prima facie case of wrongful termination, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who were not members of the protected class were retained under apparently similar circumstances. *Honor v. Booz-Allen & Hamilton,* Inc., 383 F.3d 180, 188 (4th Cir. 2004). Defendant argues that Plaintiff has failed to present evidence showing that his job performance was satisfactory at the time he was released or that his release occurred under circumstances giving rise to an inference of unlawful discrimination. (Docket No. 26 at 14.)

Plaintiff claims that he was qualified for the position from which he was terminated and that he "did what his supervisors asked him to do." (Docket No. 33 at 12.) He also contends that "[n]one of the other non-African American employees in Plaintiff's department were fired for the same or similar alleged behavior as Plaintiff." (*Id*.) Plaintiff fails, however, to point the Court to any substantial evidence that he was performing his job satisfactorily at the time he was released. (*Id*.) Even if the Court puts aside the issue of whether Plaintiff asked for and received permission to work at AT&T part-time (on which a fact issue exists), Plaintiff's supervisor Michael Greenham in his deposition identified a list of issues with Plaintiff's work performance that he had made about a week before Plaintiff's release from employment. (Docket No. 26, Ex. B at 47 & attached email note.) This list includes: (1) Mr. Greenham talking to Plaintiff about subcontractors such as Plaintiff needing

to prove their worth every day they are on the job (*see id*. at 14); (2) Plaintiff's need to submit timely "CLIN 9's" when an assignment was completed (*see id*. at 47 & note); (3) a Golden, Colorado incident the details of which Mr. Greenham did not recall (*see id*. at 48); (4) the Maxim online computer incident witnessed by Jill Smith; and (5) Plaintiff's work at AT&T. Mr. Greenham also testified that he had talked to Ms. Berrett on three or four occasions about Plaintiff's performance problems. (*Id*. at 13-14.)

Plaintiff does not dispute that these issues arose, and such job performance issues are widely recognized as valid, non-discriminatory bases for an adverse employment action. *Evans*, 80 F.3d at 960. Moreover, Plaintiff may not rely on "unsubstantiated allegations and bald assertions concerning [his] own qualifications and the shortcomings of [his] co-workers" to disprove Defendant's explanation for his release or to show discrimination. *Id*. It is the perception of the decision maker as to Plaintiff's performance and qualifications that is relevant, not the self-assessment of Plaintiff. *Id*. at 960-61. Plaintiff has failed to show that he was performing his job satisfactorily when he was released.

Plaintiff has also failed to show that other employees not members of the protected class were retained under similar circumstances. He fails to present any evidence that any other employee experienced performance issues similar to those for himself set out above. (*See* Docket No. 33 at 11-13.) With regard to other employees working part-time for other companies, Plaintiff testified that DyTanyon Norman worked for AT&T also but was not fired. (Pl.'s Dep. at 150.) However, Mr. Norman was also African-American and therefore

a member of the protected class. (Docket No. 26, Ex. B at 44.) Therefore, Defendant's allowing Mr. Norman to remain employed may not be used by Plaintiff to show a prima facie case of racial discrimination. Plaintiff also identifies Nabil Faris as a person who worked for a competitor of Defendant. Mr. Faris was Lebanese. (*Id*.) Mr. Greenham testified, however, that Mr. Faris worked for Network Appliances, a storage hardware manufacturer and not an IT company. (*Id*. at 36; Docket No. 33, Ex. G at 37.) Mr. Greenham believed that working with another company in a department other than the engineering department did not present a direct conflict of interest with CSC's work. (*Id*.) Mr. Greenham was told by the AT&T employee, an engineer, that Plaintiff was working for him at AT&T. (Docket No. 26, Ex. B at 19, 43.) Therefore, Plaintiff has not shown that Mr. Faris was an employee retained under circumstances similar to his own. Plaintiff has therefore failed to establish the final element of a prima facie case.

Plaintiff raises other alleged instances of disparate treatment while he was employed by Defendant which do not fit within the prima facie case elements. (Docket No. 33 at 12.) He mentions that no African-Americans were placed in the design group. However, his not being placed into that group is dealt with in Section 3, above, and affords no basis for liability of Defendant. Plaintiff next refers to Mr. Abbott's alleged statement that they needed "the right person for the job." Plaintiff testified that this comment was made two to three weeks after he started working at CSC and was made with respect to a separate project, "something called MPLS," and not about Plaintiff's possible move to the design group. (*See*

Docket No. 33, Ex. F at 88-90.)  Therefore, this comment is unrelated to both his not being placed in the design group and his release from employment which occurred some ten months later.  This remark can afford no basis for liability of Defendant.

Finally, Plaintiff raises the November 2006 incident where, according to Plaintiff, CSC executive Richard Mann made a facial expression of anger toward Plaintiff when Plaintiff glanced at a white woman.  (Pl.'s Dep. at 138-39.)  Plaintiff speculates that this expression was due to his being an African-American and the woman being white.  Yet, there is nothing in the record to support this speculation.  This incident was an isolated event occurring about four months prior to Plaintiff's release from employment.  Even if this event were considered to be similar to a derogatory remark, it cannot be used to prove discriminatory animus because it was isolated and there is no showing of a relation to Defendant's release of Plaintiff from employment.  *See Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

Because Plaintiff has failed to establish a prima facie case of discriminatory discharge, summary judgment should be granted in favor of Defendant.  Even if Plaintiff could be considered to have shown a prima facie case, Defendant has presented evidence showing that there were legitimate, non-discriminatory reasons for Plaintiff's release from employment, as discussed above.  The burden would then shift back to Plaintiff to show that the given

reasons were merely a pretext for discrimination.  *See Evans*, 80 F.3d at 959.  Based on the

summary judgment record described in this opinion, Plaintiff could not satisfy this burden.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant's Motion for Summary

Judgment (Docket No. 25) is **GRANTED** as set out above, and that this action is

**DISMISSED WITH PREJUDICE**.  **IT IS FURTHER ORDERED** that Defendant's

Motion to Strike (Docket No. 35) is **DENIED**.


_____
/s/ P. Trevor Sharp
United States Magistrate Judge

Date:  August 23, 2010